IN OPEN COURT

DEC 1 3 2024

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

UNITED STATES OF AMERICA,

    v.

ANDREW CORBMAN,

       *Defendant.*

Case No. 1:24-cr-

## STATEMENT OF FACTS

The parties stipulate that the following facts are true and correct and that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.    Defendant ANDREW CORBMAN lived and worked in and around Ashburn, Virginia, within the Eastern District of Virginia. He was affiliated with a well-known, national estate planning company through which he obtained access to individuals interested in estate planning and setting up trust vehicles.

2.    In 2016, CORBMAN was suspended and then permanently barred by FINRA from acting as a financial advisor for exposing customers to risk of loss that exceeded investment objectives, exceeded risk tolerance, and engaging in unauthorized trading. Information about CORBMAN's debarment is publicly available on the SEC and FINRA websites. CORBMAN had also filed bankruptcy in 2015.

1

3.    CORBMAN offered financial advice to clients and potential clients, including assisting them with long-term financial planning such as trusts, annuities, and life insurance. Through this role, CORBMAN learned about his clients' assets and net worth.

4.    Over a period of years, CORBMAN worked with two individuals and two couples (the "Clients") who eventually loaned him money on the belief that he would invest those funds and earn outsized returns. These Clients did not know about CORBMAN's status with FINRA or his 2015 personal bankruptcy.

5.    At some point in his relationships with the Clients, CORBMAN suggested they could improve their investment returns if they loaned him money or rolled over existing loans they had made to him. Through false claims of investing success, CORBMAN induced his Clients to loan him at least $750,000 and up to $4.2 million, promising to invest or continue investing the money in stock market options trading. CORBMAN promised to repay the loans at high rates of return, as much as a 30 percent annual interest rate, plus a share of his own trading profits.

6.    On at least one occasion, CORBMAN promised to pay any taxes due if the Client would roll over their investments and continue to invest with him. In this way, when the loan agreements expired, CORBMAN convinced the Clients to roll their loans over for an additional year or years, claiming the investments were doing exceedingly well.

7.    Via email and in person, CORBMAN materially misrepresented his past trading performance to induce the Clients to invest or to reinvest what he owed them when the loans came due in the form of a new loan. CORBMAN provided at least two of his potential clients a document he claimed showed his 2021 investment results. The document boasted "112 wins, 82% win history

2

and a 90% average return." In fact, CORBMAN's trading history for each year from 2019 onward resulted in substantial losses.

8.      In 2020, CORBMAN took in $530,000 from clients and lost $360,466.59. In 2021, CORBMAN took in $930,000 from clients and lost $854,594.27. In 2022, CORBMAN took in $740,000 from clients and lost $483,857.84. Altogether, CORBMAN lost over $4,000,000 of his clients' monies. He returned only $120,000 to one victim late in the scheme.

9.      CORBMAN emailed material misrepresentations about his investing performance using a yahoo email account. Yahoo maintained its servers outside of the Commonwealth of Virginia, thus each email CORBMAN sent was interstate in nature, even if CORBMAN and his clients were sent or received the emails within the Commonwealth of Virginia. Further, clients who invested with CORBMAN based on these misrepresentations sent him signed loan agreements and some of the checks through the U.S. mail or a commercial delivery service.

10.      During this time period, Fidelity sent CORBMAN written notifications that his trading was risky and that he was incurring substantial losses. On at least four occasions, Fidelity advised him to review his trades and required him to sign an acknowledgment that he had been warned before his trading privileges would be reinstated. CORBMAN signed the acknowledgements to continue to engage in the same risky pattern of trading.

11.      CORBMAN, fully aware of the risks and the calamitous results he was producing, not only concealed the risks from his Clients, but actively misled them in an attempt to stave off requests for funds and to attempt to obtain new funds. Rather than telling the truth, CORBMAN emailed his victims fabricated trading win histories.

3

12.    For example, on February 2, 2021, CORBMAN emailed Clients B.M. and D.D. documents and a written summary of his supposed wins. He wrote: "Currently with gains you are due $287,000. $60,000 for interest and $37,000 for 10% of my gains." Encouraging them to reinvest for the coming year, he further wrote: "This also benefits me as I have done very well and would have more money to work with in the coming year." CORBMAN proposed to credit B.M. and D.D. $300,000 as what they were owed from the initial loan and initiate a new loan for $300,000 with the same terms. CORBMAN asked if they were unhappy with his results.  On February 3, 2021, victim B.M. wrote back in response to CORBMAN's question, as follows: "Happy with the results? Damn right! Can you do it again?" To which CORBMAN replied the same day via email, "Haha. I definitely feel I can do it again!!!"

13.    Likewise, on June 21, 2021, CORBMAN emailed Clients J.A. and M.A. in an attempt to roll over the investment and stave off a request to be cashed out. CORBMAN wrote: "The loan I have with you in coming due in late July for $2.2 million. You will have close to $950,000 in gains that will be taxable." In reality, CORBMAN had lost almost all of their money at the time he wrote the email. CORBMAN further wrote that he would pay their taxes on the profits and return even more profits if they were to roll the investment over another year. In response to questions, CORBMAN further wrote via email to victim J.A. on June 28, 2021, "[y]our loan is safe." At the time CORBMAN wrote this, he had taken in $1,250,000 from victim J.A. and had only $65,607.67 remaining in his Fidelity trading account as on June 30, 2021. His year-to-date losses amounted to $757,274.46, with a loss for the month of June of $65,305.89.

14.    On August 2, 2021, CORBMAN wrote a similar email to victim K.L. to induce her

4

to roll over her loan. On August 16, 2021, CORBMAN confirmed receipt via the mail of a completed loan agreement from Individual K.L.

15.    On January 27, 2022, CORBMAN wrote to victim W.F. a similar email to roll over his loan. In this email, CORBMAN wrote that "I have done incredible over the past 2 years and in 1 more year will reach my goal of having $5,000,000 of my own." He also attached falsified investment results to the email. At the time he wrote this, CORBMAN had suffered more than $2,500,000 in losses in the preceding three years.

16.    The same day, on January 27, 2022, CORBMAN wrote to victims B.M. and D.D. that "you have a gain of $610,000 ..." after he acknowledged their financial needs associated with healthcare of D.D.'s mother. After promising more stellar profits if they kept their money with him, CORBMAN attached falsified financial investment results to the email. At the time he wrote this, CORBMAN had suffered more than $2,500,000 in losses in the preceding three years

17.    In late 2022 and early 2023, when CORBMAN's creditors ultimately demanded repayment of their expired loans agreements, CORBMAN finally indicated to his clients that he was unable to repay the loans due to unanticipated trading losses.

18.    CORBMAN ultimately filed for bankruptcy in the Eastern District of Virginia, seeking to discharge over $4 million in losses he had inflicted on his clients. In depositions in 2024, CORBMAN, represented by counsel, admitted under oath to the losses and that he had intentionally falsified his trading history to clients to induce them to part with money.

19.    As a result of CORBMAN's losses due to his fraudulent scheme, at least one victim incurred substantial financial hardship, including having to mortgage a home; postpone retirement;

and seek employment at an advanced age.

     20.    This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

     21.    Furthermore, this statement of facts is an admission of the defendant that can be used in subsequent court proceedings against him. This statement of facts does not constitute and is not part of compromise negotiations under Fed. R. Evid. 410 or any other provision of federal law. As such, defendant agrees that this statement of facts should not be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

     22.    The actions of the defendant, as recounted above, were in all respects willful and deliberate, and were not committed by mistake, accident, or other innocent reason.

 

JESSICA D. ABER
United States Attorney

By: _____

Russell L. Carlberg
Assistant United States Attorney

I have consulted with my counsel regarding this Statement of Facts. I knowingly and voluntarily agree that each of the above-recited facts is true and correct and that had this matter gone to trial the United States could have proven each one beyond a reasonable doubt.

12|13|2024
Date

Andrew Corbman
Defendant

I am counsel for defendant, Andrew Corbman. I have carefully reviewed this Statement of Facts with him and, to my knowledge, his decision to agree to this Statement of Facts is an informed and voluntary decision.

12|13|2024
Date

Cadence Mertz
Counsel for Defendant

7