IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No.: 1:24-cr-255-MSN |
| v. | ) | |
| | ) | |
| ANDREW CORBMAN, | ) | Sentencing: May 1, 2025 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>UNITED STATES' POSITION ON SENTENCING</u>

The United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, and Russell L. Carlberg, Assistant United States Attorney, hereby submits its position with respect to the sentencing of defendant Andrew Corbman ("Corbman").

Corbman, an estate planner and financial advisor, defrauded his elderly clients of over $4 Million in principle loss (and other $6 Million in promised interest payments). He abused his position of trust with clients to obtain the funds, despite a prior debarment by FINRA in 2016 for breach of fiduciary duties and misleading practices with clients. Despite knowing the securities laws and not contesting very serious allegations in 2016, Corbman went on to cultivate elderly individuals as clients, then promised them 30% annual returns from his stock market trades, something that in and of itself was impossible and indicative of his fraudulent intent.

Having obtained his clients' money, Corbman then engaged in wildly speculative technical stock trading that resulted in massive losses. To lull his victims and to continue his crimes undetected, Corbman sent them falsified trading histories, claiming wins in the market, when, in reality, at the same time his brokerage was freezing his accounts for excessive losses. Only when

Corbman was out of funds and clients were demanding their money back did he finally tell them he had lost the funds. He then sought to discharge the obligations in a bankruptcy proceeding, which his victims contested and had to litigate against him. Indeed, judging from the record in the bankruptcy proceeding, including the depositions, Corbman's attitude was that these were simply unsecured loans and victim money was his to do with as he pleased, consequences be damned. It is unclear to what extent the defendant has evolved beyond that position as he faces this Court. Sadly, Corbman's criminal scheme caused substantial financial harm to his victims.

The United States agrees with the Probation Officer's scoring of the Guidelines. The defendant scores an offense level of 26, with a criminal history category of I, resulting in a Guidelines range of **63 to 78 months**. PSR ¶¶ 44-54. The United States respectfully asks this Court to impose a sentence within the Guidelines range. Neither the government, nor Probation, have seen anything from the defendant that would justify a downward departure under the Guidelines. On the contrary, this defendant should be sentenced to a substantial term of imprisonment given the willful nature of this crime, his betrayal of private trust, and the severe financial and emotional harm he caused his elderly victims. A sentence pegged to the Guidelines will "achieve" the statutory goals of federal sentencing in this case, given all of the aggravating factors; a substantial downward variance will not. *United States v. Fitzpatrick*, 126 F.4 348, 352-353 (4th Cir. 2025); 18 U.S.C. § 3551(a).

## I.  FACTUAL SUMMARY OF OFFENSE CONDUCT

Corbman worked as an estate planner and financial advisor in Ashburn, Virginia. Over a period of years, Corbman had earned the trust of his clients, many of whom were elderly and interested in risk-averse investments to fortify their retirement savings. Corbman was able to discover his clients' assets and net worth during discussions about financial and estate planning.

Corbman did not disclose his checkered past with FINRA or his 2016 personal bankruptcy to his clients. PSR ¶¶ 17-19.

As discussed further in the section covering loss under the Guidelines, Corbman had passed multiple industry and state law securities exams, and knew full well what constituted false or misleading practices with respect to disclosures to clients concerning securities and market trading. Despite all of that, he offered each set of victims unrealizable 30% returns derived from his supposed stock market trading algorithm. Through false claims of investing prowess and material omissions concerning the same and his troubled past, and by leveraging his trusted relationships, Corbman induced his clients to loan him over $4 million, promising to invest the money in stock market options trading. As noted, Corbman promised to repay the loans at high rates of return, as much as a thirty percent annual interest rate, plus a share of his own trading profits. PSR ¶¶ 20. Corbman would also promise to pay any taxes due if clients would roll over their investments and continue to invest with him in a subsequent year. PSR ¶¶ 21. In this way, when the loan agreements expired, Corbman convinced creditors to roll their loans over for an additional year or years, claiming the investments were doing exceedingly well.

Via email and in person, Corbman materially misrepresented his past trading performance from the start to induce clients to invest with him. Corbman provided at least two of his clients a document he claimed chronicled the results from his year 2021 of investments. The document boasted, "112 wins, 82%-win history and a 90% average return." In fact, Corbman's trading history for each year (2019 onward) resulted in substantial losses. PSR ¶¶ 22.

Corbman's actual investment performance, as revealed in his Fidelity Investment Reports, shows that he knowingly deceived his victim lenders. From the beginning, he incurred massive trading losses with his clients' funds. At the same time, Corbman misrepresented his investment

3

performance and obtained additional funds from clients based on the material misrepresentations that he was winning big in the market.

For instance, in 2019, Corbman took in $2,070,000 from investors. He lost $1,412,271.75 in his Fidelity investment account for that calendar year. In 2020, Corbman took in $530,000 from clients and lost $360,466.59. In 2021, Corbman took in $930,000 from clients and lost $854,594.27. In 2022, Corbman took in $740,000 from clients and lost $483,857.84. Altogether, Corbman lost over $4,000,000 of his clients' monies. He returned only $120,000 to one victim late in the scheme.

During these years (2019-2023), Fidelity sent Corbman written notifications that his trading was risky and that he was incurring massive losses. On at least four occasions, Fidelity advised him to review his trades and required him to sign an acknowledgment that he had been warned before his trading privileges would be reinstated. Corbman signed the acknowledgements to continue to engage in the same risky pattern of trading, with resulting devastating losses for his clients.

Clients explicitly told Corbman that they could not afford losses or risky investments. Yet, Corbman, fully aware of the risks and the calamitous results he was producing, not only concealed the risks from his clients, but actively misled them in an attempt to stave off requests for funds and to attempt to obtain new funds. Rather than telling the truth, Corbman emailed his victims fabricated trading win histories. For example, on February 2, 2021, Corbman emailed victims B.M. and D.D. documents and a written summary of his supposed wins. He wrote: "Currently with gains you are due $287,000. $60,000 for interest and $37,00 for 10% of my gains." Encouraging them to reinvest for the coming year, he further wrote: "This also benefits me as I have done very well and would have more money to work with in the coming year." Notwithstanding Corbman's

mathematical error with victim D.D. pointed out over email ("[u]nless I missed something $60,000 plus $37,000 is $97,000 not $87,000") they reinvested after Corbman offered in reply to make it $100,000 and asked them if they were unhappy with his results. On February 3, 2021, victim B.M. wrote back in response to Corbman's question, as follows: "Happy with the results? Damn right! Can you do it again?" To which Corbman replied the same day via email, "Haha. I definitely feel I can do it again!!!"

Likewise, on June 21, 2021, Corbman emailed victims J.A. and M.A. in an attempt to roll over the investment and stave off a request to be cashed out. Corbman wrote: "The loan I have with you in coming due in late July for $2.2 million. You will have close to $950,000 in gains that will be taxable." In reality, Corbman had lost almost all of their money at the time he wrote the email. Corbman further wrote that he would pay their taxes on the profits and return even more profits if they were to roll the investment over another year. In response to questions, Corbman further wrote via email to victim J.A. on June 28, 2021, "[y]our loan is safe." At the time Corbman wrote this, he had taken in $1,250,000 from victim J.A. and had only $65,607.67 remaining in his Fidelity trading account as on June 30, 2021. His year-to-date losses amounted to -$757,274.46, with a loss for the month of June of -$65,305.89. On August 2, 2021, Corbman wrote a similar email to victim K.L. to induce her to roll over her loan.

On January 27, 2022, Corbman wrote to victim W.F. a similar email to roll over his loan. In this email, Corbman wrote that "I have done incredible over the past 2 years and in 1 more year will reach my goal of having $5,000,000 of my own." He also attached falsified investment results to the email. At the time he wrote this, Corbman had suffered massive losses.

In late 2022 and early 2023, when Corbman's creditors ultimately demanded repayment of their expired loans agreements, Corbman finally indicated to his clients that he was unable to repay the loans due to unanticipated trading losses.

The defendant ultimately filed for bankruptcy in the Eastern District of Virginia, seeking to discharge over $10 Million he owed the four sets of victims in this case ($4 Million in principle, plus 30% annual interest he promised them). In depositions in 2024, Corbman, represented by counsel, admitted under oath to the losses and that he had intentionally falsified his trading history to clients to induce them to part with money. Nevertheless, he apparently felt justified in his conduct and continued to seek to discharge all of the liability he took on.

Although the majority of victim funds were lost in his ruinous stock trades, Corbman also spent victim money on himself. A very conservative FBI financial analysis shows that Corbman spent the following sums directly traceable to victim funds, totaling at least $325,000:

| | |
|---|---|
| Fidelity & Guaranty Life Insurance | $124,770 |
| Culbert + Schmitt PLLC | $74,544 |
| Tuition Payments | $30,693 |
| Fay Servicing | $24,651 |
| Tax Payments to US Treasury | $21,120 |
| Capital One Credit Card Payments | $16,719 |
| Legend Financial Marketing Services | $12,342 |
| Cash Withdrawals | $10,000 |
| Protective Life Insurance | $5,403 |
| Individual A.B. | $5,000 |

As a result of Corbman's fraud, victims incurred substantial financial hardship. Victims had to mortgage a home; postpone retirement; seek employment at an advanced age; struggle to pay medical expenses; and forego plans to pay for the college tuitions of grandchildren.

## II.  GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing."  543 U.S. 220, 264 (2005); *see also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id*. at 49–50; *see also Clark*, 434 F.3d at 685. The advisory Guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes"). The Sentencing Guidelines' recommended ranges are advisory, but where the "district court decides that a sentence outside the [Guidelines'] advisory range is appropriate, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Morace*, 594 F.3d 340, 346 (4th Cir. 2010) (*quoting Gall*, 552 U.S. at 50). As such, "[a] major departure from the advisory range 'should be supported by a more significant justification than a minor one.'" *Id*. (*quoting Gall*, 552 U.S. at 50).

### A.      The Base Offense Level and Loss Amount

The base offense level of 7 is not in contention. The actual loss amount was $4,150,000. As such, an 18-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(J).

The defendant disputes the loss amount. He claims that he did not affirmatively lie to some of the victims at the very outset of the fraud (although he admits he lied to other victims at the outset). The defendant misapprehends the mail fraud statute, claiming it only criminalizes fraud in the inducement via affirmative misrepresentations. That is legally incorrect, as explained below. Moreover, the defendant also ignores that he also sent lulling statements and other material misrepresentations to the victims to induce them to roll over their investments year after year. And he ignores the implications of his ridiculous promises of being able to earn more than 30% annually in the stock market, which underlay the entire premise of the scheme.

The phrase "any scheme or artifice to defraud" a person of money or property is an alternative path to criminal liability in the mail and wire fraud statutes, existing in parallel to the phrase "by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.  The first concerns a deceptive plan or scheme that relies on omission of material fact, while the latter captures affirmative material falsehoods. Indeed, "[i]t is hornbook law that material omissions can form the basis for fraud as much as material misrepresentations." *United States v. Colton*, 231 F.3d 890, (4th Cir. 2000) (finding that fraudulent concealment or suppression of material facts supported bank fraud prosecution) (citing *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985) (concealment of material information can constitute fraud under mail fraud statute).

Half-truths and vague statements also constitute evidence of a scheme to defraud.  *See United States v. Woolf*, 2009 U.S. Dist. LEXIS 98857, *63 (E.D. Va. 2009); *United States v.*

*Lowry*, 409 F. Supp. 2d 732, (W.D.Va. 2006) (indicating that use of false promises and half-truths to persuade victims who already parted with money that they had not been defrauded and defendants were performing as promised can constitute mail fraud) (*citing United States v. Sampson*, 371 U.S. 75, 77-78 (1962) (describing mail fraud scheme as one contemplating use of propaganda, false promises and half-truths).

Put differently, sufficient evidence of a scheme to defraud can rest entirely on truthful statements if there are also significant material omissions calculated to deceive a victim. *See United States v. Souder*, 436 F. App'x 280, 286-289 (4th Cir. 2011). In other words, acts taken to create a false impression can suffice, even if specific truthful facts are disclosed. *Id*. at 286 (holding that statute covers acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information). In other words, "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter" may constitute a scheme to defraud. *Colton*, 231 F.3d at 899; *see also Lustiger v. United States*, 386 F.2d 132, 136 (9th Cir. 1967) ("while the statements in the advertising material may not have been literally false, taken as a whole they were fraudulently misleading and deceptive"); *United States v. Woods*, 335 F.3d 993, 997-998 (9th Cir. 2003) ("[t]he arrangement of the words or the circumstances in which they are used may create an appearance which is false or deceptive, even if the words themselves fall short of this.").

Here, in addition to affirmatively lying to induce B.L. and others to invest with him, Corbman concealed highly material facts about his actual performance in the market from all investors at the inception of his scheme. Corbman created the false impression that he was making huge returns, and that victim money was being safely and wisely invested. He then took affirmative steps to conceal the crime and to lull each and every victim afterwards by emailing false

performance histories, reassuring them, and offering incentives to all over investments. He also did not disclose to his victims the material fact of his prior debarment at the hands of FINRA, despite painting an historical biographical picture of himself as a trusted, high-performing, successful financial advisor (see more on this under the abuse of position of trust discussion, below).

Moreover, the scheme to defraud that the defendant is guilty of captures the entire scheme that he executed, not just the one mailing in the Criminal Information. And that includes the relevant conduct under U.S.S.G §1B1.3. Underlying the entire scheme is the defendant's promise of ridiculous 30% annual returns in the stock market, which alone is a misrepresentation in and of itself, and certainly deceptive and contrary to everything the defendant learned as an industry professional

Indeed, the defendant was a longtime financial advisor and industry professional who had a deep understanding of the fiduciary duties governing investment advisors like himself and the federal and state laws and regulations governing deceptive and illegal practices related to equities. According to Corbman's FINRA record (available on line), portions attached at **Exhibit 2**, he had passed the following industry and state securities law exams:

### General Industry/Product Exams

| Exam | | Category | Date |
| --- | --- | --- | --- |
| B | Securities Industry Essentials Examination | SIE | 03/24/2016 |
| B | General Securities Representative Examination | Series 7 | 07/19/1994 |

### State Securities Law Exams

| Exam | | Category | Date |
| --- | --- | --- | --- |
| IA | Uniform Investment Adviser Law Examination | Series 65 | 09/15/2010 |
| B | Uniform Securities Agent State Law Examination | Series 63 | 07/21/1994 |

According to the FINRA website (https://www.finra.org/registration-exams-ce/qualification-exams/securities-industry-essentials-exam), the SIE exam the defendant passed is described as follows:

> The Securities Industry Essentials® (SIE®) Exam is a FINRA exam for prospective securities industry professionals. This introductory-level exam assesses a candidate's knowledge of basic securities industry information including concepts fundamental to working in the industry, such as types of products and their risks; the structure of the securities industry markets, regulatory agencies and their functions; and prohibited practices.

The Series 7 exam the defendant passed is much more involved, covering extensive aspects of many types of securities and myriad FINRA rules and SEC rules and regulations, including Section 10(b) of the 1934 Securities Exchange Act covering forbidden deceptive practices. It also covers appropriate disclosures and recommendations to clients. *See* **Exhibit 3** (FINRA General Securities Representative Qualification Examination (Series 7)).

The two state securities law examinations the defendant passed also covered similar material, including deceptive and unlawful conduct. One of the subjects of the Series 65 exam is the Uniform Securities Act (1956). That model code incorporates analogues to Section 10(b) of the 1934 Act, as well as myriad regulations governing misleading and fraudulent conduct. In sum, the defendant knew full well what his duties were to his clients. He understood what the truth was. By promising 30% returns pegged to his market performance (actually higher than that, since he also promised to cover taxes and cut victims in on a share of his supposed winnings), he certainly promised them something he knew he could not achieve and that, moreover, was wildly risky and speculative, the latter being material facts he failed to disclose. The fact that he then went on to fabricate fake trading histories and to lie repeatedly over a period of years indicates his intent to defraud each and every client who gave him money.

The words of victim J.A., who lost $1,250,000 of his life savings to Corbman capture the absurd premise of Corbman's scheme:

> He came to me and explained that he was a money manager and routinely invested in options trading. He explained that in his experience options trading was very safe and profitable. He asked to borrow a large sum of money from me, $1,255,000 at 35% interest. He said he would return the money with interest in one year. Over my wife's strong objection – she had a intuitive distrust of Mr. Corbman – I agreed to loan him the money.

> A year later he came back to me explaining he had not reached all of his goals and would I let the original investment plus interest ride another year, again at 35% interest. I reluctantly agreed, This went for two more years when I demanded that he return the original principal and that we could sort out the interest later. I subsequent learned that he declared bankruptcy.

The entire scheme was predicated on Corbman's false picture of himself, his extravagant promises of unrealistic market returns, and then his lulling statements over years. Corbman's own bankruptcy petition (**Exhibit 4**) lists his debt to the four sets of victims as around **$10,000,000 of unsecured consumer debt** ($4 Million principle plus the outrageous 30% annual interest accrued over years). That is much higher interest than a credit card and it reveals the unreasonable and fraudulent premise of Corbman's financial arrangement with his clients: that he could take on $4 Million in debt, pay over 30% in interest per year, and still somehow turn a profit on speculative stock trades in the market. As an investment professional, he had to have known better.

Because the defendant defrauded all of the victims as described in the PSR, he is certainly responsible for the **actual loss** that he inflicted. The defendant's attempt to read the Guidelines' discussion of the greater of intended or actual loss into somehow negating the scheme to defraud (material omission) prong of the mail fraud statute (and ignoring the lulling aspect of the ongoing scheme), and thereby to wipe out actual loss, is legally incorrect and should be rejected. In addition to the many fabricated documents, the defendant emailed false lulling statements to each and every

victim in this case, and those emails and other documents will be available at the sentencing hearing if the Court should wish to see them.

### B.    Substantial Financial Harm

Here, the defendant clearly inflicted substantial financial harm on a number of victims, thereby earning a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(iii), as the Probation Officer has corrected assessed. PSR ¶ 46.

For the enhancement to apply, Application Note 4(F) to subsection (b)(2) provides that courts shall consider, among other factors, whether the offense resulted in the victim: (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code; (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit. U.S.S.G. § 2B1.1, cmt. 4(F). These factors are non-exhaustive. This guideline was added in 2015 so that sentencing courts would "place greater emphasis on the extent of harm that particular victims suffer as a result of the offense" and such enhancement would meet the "overall goal of focusing more on victim harm." *Sentencing Guidelines for the United States Courts*, 80 Fed. Reg. 25.782-01, 25791, 2015 WL 1968941 (May 5, 2015). Even small losses can have a serious harm on a victim. *United States v. Minhas*, 850 F.3d 873, 867-79 (7th Cir. 2017). Loss of savings and postponing retirement clearly qualify under the guideline. *United States v. Brandriet*, 840 F.3d 558, 561-62 (8th Cir. 2016). The Third Circuit recently upheld the substantial harm enhancement for more than five victims, most of whom had lost between $9,500 and $16,000 each, because of impacts on savings, changes in retirement plans, and a victim's need to work a second job as a result of the fraud. *United States v.*

*Poulson*, 871 F.3d 261, 271-72 (3d Cir. 2017).

Victim K.L. lost over $1.7 Million in principle through Corbman's abusive scheme. Because of this loss, she cannot afford to be in assisted living. Corbman's betrayal and bad faith advice—designed to fuel his unquenchable thirst for stock market gambling—led her to liquidate her 401(k), which incurred massive tax penalties Corbman did not tell her about. As a result, she had to take out a mortgage on her previously paid-off home to pay taxes and IRS penalties that Corbman caused her to suffer. This has resulted in 49% of her current monthly income going to service that debt. This has impacted her ability to pay for her grandchildren's education and forced her to make other life-altering changes.

Victim B.M. wrote that the $1 Million losses Corbman inflicted on him and his spouse, D.D, mean that "we cannot now pay off our remaining mortgages, which would have given us the more financially secure retirement we had worked so hard for while serving our nation." This led to the loss of funds to pay for serious health issues.

### C.    Abuse of Position of Trust

The defendant certainly abused a position of trust, thus +2 levels are properly added under U.S.S.G. § 3B1.3.  Application Note 1 to §3B1.3 specifies that the adjustment applies where the defendant exercises "managerial discretion (i.e., "substantial discretionary judgment . . .)" over the enterprise. Application Note 1 to §3B1.3 further specifies that embezzlement of client funds would certainly qualify for the enhancement. Even more germane, Application Note 3 to 3B1.3 makes clear the enhancement applies to a defendant like Mitchell who "provides sufficient indicia to the victim that the defendant legitimately held a position of private or public trust, when in fact, the defendant does not." The Application Note goes on to state that actions such as masquerading as "a legitimate investment broker" assumes a position of trust, relative to the victim, that provides

the defendant with the same opportunity to commit [the crime] that the defendant would have had if the position were held legitimately."

The Fourth Circuit, in applying the abuse of position of trust enhancement to a defendant, explained its reasoning as follows:

> Overall, the question of whether a defendant held a position of trust must be approached from the perspective of the victim. *United States v. Moore*, 29 F.3d 175, 179–80 (4th Cir.1994). Because the inquiry requires a "sophisticated factual determination," a trial court's finding will be reversed only if clearly erroneous. *United States v. Helton*, 953 F.2d 867, 869 (4th Cir.1992).

*United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995).  "From the perspective of the victims," *id.*, it is abundantly clear that defendant Corbman assumed a position of trust when he acted as an estate planner and financial advisor to the victims in this case.  He purportedly had the best interest of his victims at heart, or so they believed, when, in reality, he was deceiving them. They entrusted him with their financial information, and believed in him when he advised that he could safely earn them higher returns than in traditional investments. The kind of private trust the defendant betrayed is at the heartland of this particular Guideline victim-related adjustment.

Much less formal relationships than estate planner and financial advisor have been held to be positions of private trust. For example, the Seventh Circuit has noted that the cultivation of prior relationships for use in executing a fraud scheme constitutes abuse of trust under the Guidelines. *See United States v. Burke*, 125 F.3d 401, 406 (7th Cir. 1997) ("[w]hat is relevant is whether Burke relied on the relationships he previously had established with those three victims to further his fraudulent securities scheme. If Burke did create a relationship of trust with customers from his sales for the AART, and then abused that trust in order to sell his fraudulent securities, then the district court properly enhanced his sentence under § 3B1.3."). Courts routinely apply the enhancement to those who abuse "pre-existing relationships" such as friendships and familial

15

relations in the service of a fraud scheme. *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (perpetrator a "family friend" who also familial relations among victims); *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002) ("Mabrook relied on at least one close and long-term friend, Dr. Rahim, to invest in his fraudulent scheme. Therefore, with respect to Dr. Rahim, Mabrook was not engaged in an arms-length transaction; rather he used his friendship to convince Dr. Rahim that the investment was safe and profitable."). Here, Corbman took advantage of both longer-term and newer clients, leveraging his position as an estate planner and financial advisor into their lives and into their finances.

Here, Corbman exploited trusting, elderly victims. He was their estate planer and financial advisor. For example, according to victim K.L., his website stated:

> Known to be wealth management professional, Andrew S. Corbman has ensured the delivery of trustworthy financial growth instruments that get better with time and in profitability. A talented visionary and dependable financial planner, Mr. Corbman is aware of the huge role he plays as a financial professional in the lives of his clients and their families. Inspired to deliver nothing less than reliable products through his own firm, ASC Financial, Inc., Mr. Andrew Corbman helps retirees find ways that work to expand their investments.[1]

These words of the defendant alone should qualify him for the abuse of trust enhancement. Indeed, it is hard to understand how he now disputes this, as well as the loss amount. Moreover, nowhere in this self-described professional history did Corbman disclose his FINRA debarment or his previous bankruptcy – clearly material facts to these victims. Each of the victim impact statements discuss the level of both personal and professional trust the victims placed in the defendant. "[F]rom the perspective of the victim[s]," *Gordon*, 61 F.3d at 269, this enhancement certainly applies.

---

[1] **Exhibit 1** to this brief contains screenshots of Corbman's LinkedIn profile and his website bio page, both taken on Tuesday, April 22, 2025.

### D.    Acceptance of Responsibility / Zero Point Offender

The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). PSR ¶ 91. Accordingly, the government moves for the additional one-point reduction under U.S.S.G. § 3E1.1(b). Because the defendant's actions caused substantial financial harm to victim K.L. and others, the zero-point offender reduction does not apply to Corbman.

### III.    IMPOSITION OF SENTENCE

In the recent words of the Fourth Circuit: "A defendant found guilty of an offense must be sentenced in accordance with 18 U.S.C. §§ 3551–3559 'so as to **achieve** the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.' 18 U.S.C. § 3551(a)." *Fitzpatrick*, 126 F.4 348, 352 (emphasis added). Those subparagraphs provide that a district court must impose a sentence

> sufficient, but not greater than necessary ... (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The Supreme Court has characterized these purposes as retribution (punishment), deterrence, incapacitation, and rehabilitation. *See Rita v. United States*, 551 U.S. 338, 347–48, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). And in fulfilling sentencing's purposes, a district court must consider and weigh (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentencing disparities; and (6) the need for restitution. 18 U.S.C.

§ 3553(a). Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory Guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

### A.     Nature, Circumstances, and Seriousness of Offense

The defendant targeted elderly clients who were veterans and people who had worked their entire lives to amass a substantial retirement account. The defendant mercilessly exploited his position of trust, lying to victims about his qualifications and about his performance in the stock market. He took in over $4 Million of their life savings, which he lost in reckless futures trading, while stopping along the way to pilfer over $350,000 for his personal needs.  Corbman continued the scheme over a period of years, fabricating trading histories that he emailed to victims, and lulling victims into a false sense of security. When the scheme collapsed, he initially sought to find more clients through newspaper and on-line advertisements aimed at the elderly and to raise more money even from his current victims who were already tapped out. Then he consulted an attorney and filed for bankruptcy in an attempt to discharge the victims' losses.

The seriousness of this offense is best captured in the victim impact statements. Victim K.L. wrote that "Mr. Corbman stole approximately $1.7 million plus dollars of my hard-earned life savings through his fraudulent trust and investment schemes.  I never imagined that someone I trusted with my financial future would take advantage of me in such a devastating way."

Her words are heartbreaking and capture the impact of Corbman's criminal conduct beyond the staggering amount of money he stole (emphasis added):

> This loss has had an immeasurable impact on my life.  These savings were not just numbers on a balance sheet—**they represented my lifetime of hard work, sacrifice, and dreams for a secure and comfortable future**.  The funds were meant to sustain me through retirement and my passing; provide for my family; and

offer me peace of mind. Instead the funds are gone, **leaving me with financial uncertainty and emotional distress**.

**The betrayal I feel is profound**. **I trusted Mr. Corbman as a professional, believing his promises that my investments were safe and secure. He preyed on that trust manipulating me for his own personal gain.** Mr. Corbman paid for weddings; his daughter's car payments; his son's bill at Virginia Tech; and loans made from his mother. His actions have not only left me financially devastated but has also eroded my ability to trust others. I find myself second-guessing every decision and questioning the intentions of anyone I engage with professional or personally.

The stress and emotional impact led to drastic lifestyle changes for this retired person, and to stress and poor health:

The financial loss has forced me to drastically alter my lifestyle. I have had to give up plans that I spent years building. Simple things I once took for granted are now out of reach; and the fear of not being able to support myself, especially as my health declines, is a constant source of anxiety.

**Emotionally, the weight of this crime is unbearable at times. The stress, sleepless nights, and a lingering sadness have taken a toll on my health and well being**. It is difficult to describe the feeling of having everything you worked for ripped away by someone who acted with such blatant disregard for the consequences of their actions.

Corbman's true nature is revealed by the extent of the damage he knowingly caused to victim K.L. In advising her to liquidate her 401(k) in order to fund his stock market gambling, Corbman concealed from her the terrible tax consequences that would befall her, something he clearly knew well at the time:

Not only did Mr. Corbman rob me of over $1.7 million, he delivered a final punch that will remain with me for the rest of my life. Mr. Corbman had cashed out my IRA savings and I was forced to take out a new mortgage of $225,000 to pay IRS and Virginia state taxes. My home had been paid for and now I had a monthly payment of 49% of my monthly retirement going to pay for this mortgage. This mortgage will not be paid in full until I am 94 years and 10 months old. If I die before then, my last asset, my home, will have to be sold to pay the balance on this mortgage.

Had Corbman told K.L. of these tax consequences, as was his professional and fiduciary duty as

her financial advisor and estate planner, then she most certainly would not have undertaken such a ruinous course of conduct at his direction. Of course, Corbman concealed that from her, just like he concealed his FINRA debarment, his bankruptcy, and his own ruinous performance in the stock market, all because he wanted that money to play with.

Victim B.M. wrote similarly that "[t]his has been a most depressing and stressful situation for us as we endured the costs required for us to pursue justice in this case, and over almost a three year period." B.M. wrote further that, "as a result of Corbman's devious, fraudulent behavior, we lost the bulk of our retirement savings … this is devastating to us psychologically and financially." As a result of the crime, B.M. wrote that "**we cannot now adequately financially aid and support our grandchildren and great grandchildren (eleven total) with their educational and college goals, and their major life events (first home, marriage, etc.) and any emergency financial aid they may need**" (emphasis in original). The present financial impact is also a strain of victim B.M. and his spouse: "**We cannot now pay off our remaining mortgages, which would have given is the more financially secure retirement we had worked so hard for while serving our nation. We are senior citizens, and we cannot start new carers to build savings**" (emphasis in original). B.M. also wrote that he can longer do the charitable giving he has supported over the years. And, further, "[w]e were robbed of any reserve funds we had, to help pay for serious health issues (cancer, ocular degeneration, severe arthritis, diabetes, etc.), as we age—all funds gone because of Corbman**. The psychological impacts of resulting uncertainties in our future are severely depressing."

B.D's spouse, D.D., wrote that the personal betrayal and loss of over $1 Million to Corbman has hit her husband especially hard: "I have seen my husband go into the abyss of depression over his feelings of helplessness to recover our financial losses; his physical health and

well-being continue to deteriorate." Victim J.A. wrote that the loss of $1,250,000 to Corbman has left him with the following: "I currently have in my checking account approximately $10,000 dollars. I live month to month on my Army retirement pay and Social Security."

Victim W.F., who lost $100,000, acknowledged he would recover financially, "but the emotional scars remain." That is because Corbman was a "friend and confidant" who had been their financial advisor for 20 years.

This is one of the more egregious "white collar" crime cases. From the perspective of the elderly victims (and their adult children and grandchildren), it must be truly disturbing and traumatizing to have a trusted financial advisor, who is supposed to have the client's best interest at heart, systematically lie, deceive, and cheat the victim of his or her life savings.

Only a meaningful custodial sentence will vindicate the victims and the harm they suffered in this case, especially where there is basically no money or assets to be recovered. Unlike a tax case where the harm is diffused through the general fisc, or a fraud against a major bank which can arguably more easily absorb the loss, here there are scores of real victims who were directly and proximately harmed by the defendants' crimes.

### B.    History and Characteristics of the Defendant

Corbman's crime was driven by greed, ego, and a compulsion to gamble big in the stock market by playing with other peoples' financial lives. He held himself out as a trusted financial advisor, with years of success to draw upon. In reality, he had little to his own name and had left a trail of destruction in his wake even before he had begun the instant scheme.

Corbman's FINRA debarment on or about December 9, 2016, is a clear indicator that he has been engaged in unethical and questionable conduct in the financial industry for at least ten years. Corbman did not appear for on-the-record testimony and chose not to contest the allegations

against him regarding unsuitable and unauthorized trading of securities. *See* **Exhibit 2** at page 9 (FINRA BrokerCheck Report on Andrew Scott Corbman). One of the findings Corbman consented to was as follows: "Corbman consented to the sanctions and to the entry of findings that he made recommendations that were unsuitable as they were over-concentrated and exposed customers to a risk of loss that exceeded each customer's risk tolerance and investment objectives." *Id*. at p. 10. He also sought to steer clients into an alternative mutual fund that "contained information that was misleading and failed to provide a sound basis for evaluating the alternative mutual fund referenced in it." *Id*. A number of the specific allegations that follow claim that Corbman inflicted hundreds of thousands of dollars of losses and engaged in misrepresentations and common law fraud. The report also contains details about Corbman's unpaid tax liens and a prior personal bankruptcy.

Despite this history, as **Exhibit 1** shows, Corbman went on to paint a far different picture of himself to his clients and to the public. After suffering only a FINRA debarment and no monetary penalty due to inability to pay, Corbman would not be deterred from the scheme that brings him to this Court for sentencing. Perhaps he was actually emboldened, since he largely skated away from the mess he created with his prior employer and the raft of unhappy clients left with losses from that time, only to go on to woo the victims in this case.

And this time, Corbman would go further, actually falsifying market performance documents of his own trading, and providing that to his elderly clients, all while suffering massive losses in his Fidelity trading account. And he would take at least $325,000 of his clients' money for personal expenditures, while he continued his ruinous trades on the stock market.

It is clear that Corbman needs a Guidelines jail sentence, both to incapacitate him for a substantial period of time, and, once he is released, to deter him from future criminal activity targeting elderly veterans and retirees. An excessively lenient jail sentence will more embolden

him even further. Since he was judgment proof both as to FINRA (in 2016) and remains so today as to this Court, jail is the only thing that this Court can really do to deter him.

This was entirely a crime of choice, driven by Corbman's unexplained need to play the stock market with retiree funds. It is one of the more despicable and pathetic white collar cases we see, especially considering how Corbman was an educated, industry professional who so clearly knew better than to do any of this.

### C.    General Deterrence, Just Punishment

General deterrence and just punishment have to be prime considerations in a case like this. The focus cannot solely be on the defendant. The law requires the Court to consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). That is particularly true in fraud cases, which are difficult to detect, investigate, and prosecute. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks omitted). Absent a substantial term of imprisonment in this case, general deterrence— "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The defendant's crime was deliberate, motivated by a desire for financial gain (and to avoid personal and business losses), the covered up with misleading and false explanations. These factors all counsel in favor of a more significant sentence for the sake of general deterrence. *See Harmelin v.*

*Michigan*, 501 U.S. 957, 989 (1991) (noting that crimes that are "significantly more difficult to detect may warrant substantially higher penalties").

The victims in this case all hope to see some justice done, and that includes seeing jail time for the person who stole over $4 Million from them, then fought them in adversarial bankruptcy proceedings, costing them even more in legal fees. Orders of forfeiture and restitution will not make them whole, nor provide them with much if any solace, since Corbman is basically without assets. His $250 per month payments (or something similar) once he out of jail won't go far to help victims. Only an actual retributive sentence, which here, means a multi-year jail sentence, will actually vindicate victim rights and promote respect for the law, given the specific facts and circumstances of this case.

There is a good reason that the Guidelines range is relatively high in this case and is, therefore, not overstated. This case, perhaps more than others, more accurately encapsulates the harm the various Guidelines factors seek to capture: the magnitude of the loss; the betrayal of trust; and the terrible emotional and financial consequences for the victims.

A real custodial sentence, as opposed to a very light sentence or home confinement, achieves general deterrence and just punishment in this case.

### D.    Avoid Unwarranted Sentencing Disparities

A sentence that bears a meaningful relationship to the Guidelines is best calculated to avoid unwarranted sentencing disparities, especially in this sort of case with so many victims. As the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a

disparity, but a justifiable difference). No should white collar defendants get a pass from jail, which is a consequence of serious felonious activity. *See, e.g., United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *see also United States v. Peppel*, 707 F.3d 627, 640-41 (6th Cir. 2013) (reversing overly lenient sentence for prominent businessman); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (downward departure reversed for businessman who performed substantial community service and raised money for charity, on grounds that it was "neither exceptional nor out of the ordinary for someone of his income and preeminence"). *See also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (reversing light sentence because trial court gave undue weight to letters urging leniency).

The recent Fourth Circuit case of *United States v. Fitzpatrick*, 126 F.4th 348 (4th Cir. 2025) is instructive as to why extreme downward variances in the face of serious Guidelines exposure are problematic. Fitzpatrick pleaded guilty to a scheme to sell stolen PII and also to possession of child pornography. There, the district court calculated Fitzpatrick's advisory Guidelines sentencing range to be 188 to 235 months' imprisonment. But based on Fitzpatrick's autism spectrum disorder and youth (21 years old at the time of sentencing), it sentenced Fitzpatrick to a 17-day time-served term of imprisonment, concluding that the Federal Bureau of Prisons would not be able to treat Fitzpatrick's autism spectrum disorder and that he would be "ravaged" in prison. *Id*. After discussing several errors associated with making sweeping presumptions about the Bureau of Prisons, the Fourth Circuit noted, "[a]nd, most glaringly, the court never addressed, as required, how [the defendant's] sentence '**achieve[s]**' respect for the law, punishment, deterrence, and incapacitation, all of which are core purposes of sentencing." *Fitzpatrick*, 126 F.4 at 353 (citing 18 U.S.C. sec. 3553(a)). The Fourth Circuit then went on to explain at some length why the district judge, in giving little to no weight to those core statutory sentencing factors, even if discussing

them in passing, had committed reversible error. *Id*. The Court added that extreme downward variances create their own sentencing disparities and actually undermine several sentencing goals: "the Court does not appear to have considered how such an extreme variance might contribute to unwarranted sentencing disparities." *Fitzpatrick*, 126 F.4th at 354. And further, it might actually green-light crime: "If anything, a 17-day sentence for the commission of three serious felonies signals to would-be criminals that they might get one free pass before facing any serious penalties." *Id*.

As in *Fitzpatrick*, here we have a very serious crime, a loss of over $4 Million from individual, trusting, and elderly victims, committed by their estate planner and financial advisor. Regardless of however sympathetic the defendant presents himself at sentencing, this is the same person who carried out this heartless scheme for years. And as another Fourth Circuit panel advised in an earlier opinion, even discretion has its limits, especially when it comes at the expense of the other important sentencing factors:

> While sentencing is indeed discretionary, when a district court focuses so heavily on a single sentencing purpose only tangentially connected to a defendant's grave criminal misconduct, it risks abusing its discretion. *See United States v. Howard*, 773 F.3d 519, 531 (4th Cir. 2014) (holding that the "district court abused its discretion by focusing too heavily on [the defendant's] juvenile criminal history" and doing so "at the expense of a reasoned analysis of other pertinent factors"); *United States v. Engle*, 592 F.3d 495, 504 (4th Cir. 2010) (holding that the defendant's probationary sentence was substantively unreasonable where the district court rejected the Sentencing Guidelines' recommended sentence of 24 to 30 months' imprisonment because of its "near-exclusive focus" on the defendant's ability to pay restitution). And such an abuse becomes clearer if the object of the court's focus is questionably related to the defendant's criminal conduct.

*United States v. Zuk*, 874 F.3d 398, 410 (4th Cir. 2017) (reversing 90% downward variance from Guidelines range as substantively unreasonable). *See also United States v. Engle*, 592 F.3d 495 (4th Cir.2010) (vacating the probation sentence for tax evasion where the advisory range was 24–

30 months); *United States v. Carter*, 564 F.3d 325 (4th Cir.2009) (vacating the probation sentence for felon-in-possession of a firearm where the advisory range was 37–46 months); *United States v. Pyles*, 482 F.3d 282 (4th Cir. 2007) (vacating the probation sentence for aiding and abetting drug distribution where the advisory range was 63–78 months); *United States v. Hampton*, 441 F.3d 284 (4th Cir.2006) (vacating the probation sentence for felon-in-possession of a firearm where the advisory range was 57–71 months).

In sum, the government recognizes the importance of individualized sentencing. But the sentence must also achieve other statutorily mandated goals, including just punishment (retribution or vindication of victims), to promote respect for the law, and to deter others from engaging in crimes like these. That is why a sentence within the Guidelines range, or not too far from it, best achieves all of these goals of federal sentencing.

## II.    CONCLUSION

For the reasons stated above, the United States submits that a sentence within the Guideline range of **63-78 months**, is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a). The court should also enter an order of restitution in the full amount of the loss, and grant the government's separate motion for a preliminary order of forfeiture.

Respectfully submitted,

Erik S. Siebert
United States Attorney

By:    Russell L. Carlberg
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3868
Email: Russell.L.Carlberg@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2025, I caused a copy of the foregoing memorandum to

be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a

Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Jennifer Lyerly
United States Probation Officer
Jeffifer_Lyerly@vaep.uscourts.gov

_____
        /s/

Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov
